IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | * | CHAPTER 7 |
| HEATHER JOHNSON, | * | |
|     Debtor | * | |
| | * | |
| HEATHER JOHNSON, | * | CASE NO. 1:05-bk-00666MDF |
|     Plaintiff | * | |
| | * | |
| v. | * | ADV. NO. 1:05-ap-00162 |
| | * | |
| ACCESS GROUP, INC. and | * | |
| EDUCATIONAL CREDIT | * | |
| MANAGEMENT CORPORATION, | * | |
|     Defendants | * | |

## OPINION

Before me is the complaint of Heather Johnson ("Debtor") seeking a determination that her student loan debts are dischargeable under 11 U.S.C. § 523(a)(8). She argues that she will suffer an "undue hardship" if she is required to repay the loans. For the reasons discussed below, Debtor is not entitled to the relief she requests; therefore, her complaint will be dismissed.

**Procedural History**

Debtor filed her chapter 7 case on February 9, 2005 and received a discharge on June 10, 2005. Later that year Debtor moved to reopen her case so that she could file a complaint seeking discharge of her student loan debt. The Court granted the motion to reopen on September 13, 2005. In her complaint Debtor named Access Group, Inc. ("Access"), Diversified Collection Services, Inc. ("Diversified") and SLM Corporation ("Sallie Mae") as defendants. On October 14, 2005, Access filed a motion to dismiss the case as to Diversified because Diversified was simply an

1

agent for Access and not a creditor. On March 21, 2006, the parties filed a stipulation in which they agreed to the dismissal of the action against Diversified.

Educational Credit Management Corporation ("ECMC") is a Minnesota nonprofit corporation, acting as a designated guaranty agency pursuant to the Higher Education Act of 1965, as amended, 20 U.S.C. § 1077 et. seq., and is a successor in interest to Sallie Mae. ECMC provides specialized guaranty agency services to the U.S. Department of Education and also accepts student loan accounts from other guaranty agencies when the obligor files for bankruptcy. In July 2003, Debtor consolidated her federally guaranteed loans by taking out a single consolidation loan from Sallie Mae.[1] After Debtor filed for bankruptcy, Sallie Mae filed a claim with United Student Aid Funds, which then transferred all right, title and interest in Debtor's loan to ECMC. The parties agree that ECMC is substituted for Sallie Mae as a Defendant in this case.

Trial on the complaint commenced on March 23, 2006, at which time testimony was taken regarding Debtor's entitlement to discharge of her student loans. Debtor moved for a directed verdict, arguing that the loans were not protected from discharge by 11 U.S.C. § 523(a)(8) because they were not guaranteed by the federal government. The trial was continued to allow the parties to file briefs on the private loan issue. After various continuances and delays, the parties filed briefs and on December 3, 2008, I issued an Opinion and an Order denying Debtor's motion and setting a briefing schedule on the ultimate issue of whether repayment of the loans would constitute an undue hardship. The within Opinion and accompanying Order are

---

[1] Federal regulations prohibit lenders/servicers from holding interests in certain student loans that are subject to bankruptcy adversary proceedings.

based upon the record created at the March 23, 2006 trial and the legal memoranda submitted by the parties. No admissible evidence was offered by either party to update the information in the record.[2] The matter is ready for decision.[3]

### Factual Findings

In March 2006 Debtor was a single, 33-year-old female residing in York, Pennsylvania. She had no dependents and suffered from no physical or mental conditions that would prevent her from repaying her student loans. (Pre-trial Joint Stipulations of Fact).

From August 1990 until May 1991, Debtor attended Long Island University where she studied pre-law. She later transferred to The Pennsylvania State University from which she graduated in May 1994 with a Bachelor of Science Degree in Administration of Justice. Between August 1994 until August 1998 she attended the University of Baltimore, pursuing a Masters of Science Degree in Criminal Justice, but she left in 1998 without completing her degree in order to attend Widener University School of Law. In December 2001 she graduated from Widener with a Juris Doctorate degree. Although she completed her law degree, she was unable to pass the bar examination in either Pennsylvania or Maryland. (Pre-trial Joint Stipulations of Fact).

To finance her graduate and law school education, Debtor entered into a series of fourteen federally-guaranteed student loans (the "ECMC" loans) and four private loans (the "Access

---

[2]Debtor included with her brief an affidavit containing averments of fact pertaining her employment and income in the period since March 2006. However, Debtor was not subject to cross-examination regarding the information contained in the affidavit. Therefore, the affidavit is of no evidentiary value and its contents will not be reflected in the Factual Finding or Discussion, *infra*.

[3]I have jurisdiction to hear this matter pursuant to 28 U.S.C. §§157 and 1334. This matter is core pursuant to 28 U.S.C. §157(b)(2)(A),(I) and (O). This Opinion constitutes the findings of fact and conclusions of law made under Fed. R. Bankr. P. 7052.

3

Loans"). In July 2003, the various ECMC loans were consolidated into a single loan from the Sallie Mae Trust in the original principal amount of $111,828.44, capitalized at 3.25% interest over 30 years (the "July 2003 loan"). To repay the July 2003 loan, Debtor agreed to make 359 payments of $487.96 per month beginning September 9, 2003 with a final payment in the amount of $486.06. The July 2003 loan was guaranteed by United Student Aid Funds, Inc. ("USAF"). As of November 11, 2005, the outstanding balance on the July 2003 loan was approximately $118,161.00, including capitalized interest of $6,955.00 and net credit for payments of $622.00 against principal. The outstanding principal balance on the Access Loans as of the filing date was $58,346.75, with accrued interest of $232.63, for a total current balance of $58,579.38. (Pre-trial Joint Stipulations of Fact).

After she graduated from college, Debtor was employed as a paralegal by an agency specializing in temporary placements. Between November 1996 and March 1997 she was assigned to different law firms and was responsible for document management and organization for bankruptcy, family law and personal injury cases. She left her position with the temporary employment agency when she was hired as an administrative assistant for a law firm in March 1997. In March 1998, Debtor left her position with the law firm to accept a better position with increased income at another firm, but soon opted to leave to attend law school. While working for both law firms she performed a variety of case management and paralegal duties. During law school, Debtor worked intermittently as a waitress at a variety of locations. (Pre-trial Joint Stipulations of Fact).

During law school Debtor participated in two legal internships in the York area – one with a law firm and the other with the District Attorney's office for York County. These

internships provided her with experience in a variety of civil and criminal proceedings. (Pre-trial Joint Stipulations of Fact).

After Debtor graduated from law school and while she was preparing to take the bar examination in Pennsylvania, she worked as an independent contractor in Lancaster, Pennsylvania performing paralegal duties for a variety of clients. Between July 2002 and February 2004, Debtor worked full time as a paralegal for a law firm in York, Pennsylvania, with the expectation that she would be an attorney with the firm. When she failed to pass the bar examination she was terminated. (Pre-trial Joint Stipulations of Fact).

Between June 2004 and January 2005, Debtor worked as a paralegal/legal consultant for a temporary employment agency, but she left this position when Ajilon Consulting in Towson, Maryland hired her full time. At the time of trial she was employed by Ajilon Consulting as a paralegal and assistant to the organization's chief legal counsel. (Pre-trial Joint Stipulations of Fact).

In 2004 Debtor's adjusted gross income was $31,157.00 and in 2005 it was $48,432.00. At trial, Debtor testified that she expected her total gross household income for 2006 to be approximately $50,000.00 with gross monthly income of approximately $4,291.00 and net monthly income of approximately $3,001.00. (Pre-trial Joint Stipulations of Fact). As of the date of the trial, Debtor's expenses in most categories had not changed substantially from the amounts reported in schedule I filed with her petition. Debtor reported on schedule J that her monthly expenses were $2,830.00. However, at the time of trial, Debtor no longer had a monthly car payment of $320.00, which had been included in her total monthly expenses as reported on schedule J. (N.T. 111) During the four-month period immediately before Debtor filed her

5

complaint requesting the Court to find that her student loans were dischargeable (July 2005 – October 2005), Debtor incurred expenses that were not necessary including: expensive hair treatments, manicures, visits to tanning salons, and frequent expenditures at restaurants and bars.

**Discussion**

Under the Bankruptcy Code,[4] certain educational loans are excepted from discharge unless a debtor can show that requiring repayment of the loan will impose an undue hardship on the debtor or the debtor's dependents. 11 U.S.C. §523(a)(8). In the Opinion that I issued on December 3, 2008, I determined that the four private Access loans were protected from discharge by §523(a)(8) absent a showing of undue hardship. Debtor did not dispute that she was required to show that repayment of the ECMC loans would constitute an undue hardship before this Court could find that these loans were dischargeable.

Because the Bankruptcy Code does not define the term "undue hardship," courts must review the facts of each case to determine whether the circumstances justify discharge of the debt. *In re Boston,* 119 B.R. 162, 164 (Bankr. W.D. Ark. 1990). In *In re Faish*, 72 F.3d 298 (3d Cir 1995), the Third Circuit adopted the three-pronged test for determining whether forced repayment of an educational loan would create an undue hardship for a debtor formulated by the Second Circuit in *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395 (2d Cir 1987) . Under the *Brunner* test , "undue hardship" is dependent upon three factors:

---

[4]The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 became effective on October 17. 2005. Because Debtor's case was filed in February 2005, it is subject to the law as it existed under the Bankruptcy Reform Act of 1994 and its subsequent amendments.

6

(1) [whether] the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for [herself] and [her] dependents if forced to repay the loans;

(2) [whether] additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period for student loans; and

(3) [whether] the debtor has made good faith efforts to repay the loans.

*In re Brunner*, 831 F.2d 395, 396 (2d Cir. 1987) *quoted in Faish,* 72 F.3d at 304-05.

A debtor seeking the discharge of a student loan bears the burden of proof on each element, and all three elements must be satisfied. *Id.* at 306. The standard of proof is preponderance of the evidence. If a debtor's proof fails as to any one of the elements, the court may not engage in a general consideration of the equities in the case and must find the debt to be nondischargeable. *In re Roberson*, 999 F.2d 1132, 1135 (7th Cir. 1993). "[E]quitable concerns or other extraneous factors not contemplated by the test may not be imported into the analysis of 'undue hardship.'" *In re Brightful*, 267 F.3d 324, 328 (3d Cir. 2001)(citation omitted).

In *Faish*, the debtor, a single mother earning $27,000 a year, incurred a student loan of approximately $32,000.00. She lived in a rented home in a low-income neighborhood, suffered from Crohn's disease and other ailments, and did not own a car. Despite her low income and personal difficulties, the Third Circuit found that repayment of her student loan would not constitute an "undue hardship." The Circuit determined that with some lifestyle modifications, Faish would be able to repay the debt. Notwithstanding the debtor's limited financial resources, the Court held that because she had obtained the significant benefit of an education funded by taxpayer dollars, she could not ignore that obligation simply because repayment of the funds would require some major sacrifices. *Faish*, 72 F.3d at 306. To determine whether the

educational loans in the within case may be discharged, I will examine the facts established on the record in light of the *Brunner* factors.

   a.  *Can debtor maintain a minimal standard of living while repaying the debt?*

Under the first prong of the test, Debtor must establish that she will not be able to "maintain a 'minimal' standard of living" if required to repay the loans. *Faish*, 72 F.3d at 306. *Faish* and its progeny have interpreted this first prong to require "more than a showing of tight finances." *Id.* 72 F.3d at 306; *In re Savage*, 311 B.R. 835 ( B.A.P. 1st Cir. 2004); *In re Steers,* 2008 WL 2038835 (Bankr. D. N.J. 2008)(citations omitted). A "minimal standard of living" is not a fixed measure, and the concept is not defined by bright lines. The upper limits of a minimal standard of living generally allow for a debtor to purchase "the basic necessities, such as food, clothing, housing and medical treatment." *In re Armstrong*, 394 B.R. 43, 54 (Bankr. M.D. Pa. 2008) (citations omitted). While it does not relegate a debtor to the depths of "abject poverty," *Faish*, 72 F.3d at 305, "a minimal standard of living does not accommodate 'luxury type expenses.'" *Armstrong.* 394 B.R. at 54 (quoting *In re DeGroot*, 339 B.R. 201, 209 (D. Or. 2006)). After providing for his or her basic needs, a debtor may not use her or her financial resources for discretionary expenditures in lieu of repaying student loan creditors. *In re Mitcham*, 293 B.R. 138, 144 (Bankr. N.D. Ohio 2003) (citing *In re Rice,* 78 F.3d 1144, 1149 (6th Cir. 1996)).

In 2006, when the trial in this matter was held, Debtor's net monthly income was approximately $3,001.00. Schedule J, which was filed with the petition on February 9, 2005, states that Debtor's monthly expenses were approximately $2,830.00. Assuming that Debtor's schedule J allowed for her "basic needs" and that she kept her expenses at that level, at least

8

$170.00 would have been available the end of each month for payment of her student loan creditors. Debtor also conceded at trial that she no longer had a car payment, which also would free up additional funds to assist her in repaying her student loans.

Further, a closer examination of Debtor's "necessary" expenses reveals that she should be able to reduce the amount of rent she currently is paying. Included on Debtor's schedule J was an allowance for rent in the amount of $1,100.00 per month for a two-bedroom townhouse in Baltimore, Maryland.[5] ECMC argues that a two-bedroom townhouse is not a basic need of a single person with no dependents. In this case, I agree. In *Armstrong*, I noted that "an unreasonable amount spent on an otherwise reasonable expense can show the debtor is able to maintain a minimal standard of living in spite of loan payments." *In re Armstrong*, 394 B.R. at 54. Debtor should be able to lower this expense.[6]

ECMC also adduced evidence showing that in the months prior to the trial of this matter, Debtor routinely indulged in certain luxuries beyond her basic needs. Given the opportunity at trial to explain these expenditures, Debtor's testimony was vague, at times evasive, and generally

---

[5] Debtor testified that her rent had been increased to $1,200.00 per month as of the date of the trial. (N.T. 112).

[6] In her case-in-chief, Debtor testified in general terms that she had searched in vain for cheaper housing in various other locales that she considered to be both safe and convenient. She testified that some of her applications for cheaper rental housing had been rejected due to her bankruptcy. In its case-in-chief, ECMC offered unrebutted evidence that adequate housing in various apartment complexes not far from Debtor's townhouse was offered for as little as $740.00 per month at the time of trial. (Ex. D-12). Debtor did not specifically testify regarding whether she had applied to and been rejected by these particular complexes or not. Thus, in finding Debtor's rent to be unreasonable, I do not specifically find that Debtor could have obtained housing at any of the apartments reference by ECMC. I simply find that as a single person without dependents, Debtor failed to demonstrate why she needed a two-bedroom, rather than a one-bedroom, townhouse.

9

insufficient to rebut the inference that the expenditures were unnecessary.[7] Thus, ECMC's evidence weighed against Debtor's case for discharge of the loans based upon hardship.

In light of Debtor's failure to justify her excessive rent and unnecessary consumer spending habits, I conclude that Debtor has failed to carry the burden of proof imposed on her by section 523(a)(8). For that reason alone, her complaint may be dismissed.

      b.     *Is Debtor's inability to pay likely to persist ?*

Even if Debtor had been able to satisfy the first prong of the Brunner test, she would not be able to satisfy the second. Under the second prong, Debtor must prove that she will be unable to repay her student loans and maintain a minimal standard of living for a significant portion of the loan repayment period. As noted by the Third Circuit in *Brightful*, this is a demanding test. *Brightful*, 267 F.3d at 328. "[I]t is not enough for [Debtor] to demonstrate that [she is] currently in financial straits; rather, [she] must prove 'a total incapacity . . . in the future to pay [her] debts for reasons not within [her] control." *Id.* (quoting *Faish*, 72 F.3d at 307). A present inability to pay is not enough. A debtor must demonstrate that it is unlikely that he or she will *ever* be able to repay the loans. *See In re Ballard*, 60 B.R. 673, 675 (Bankr. W.D. Va. 1986).

In *Brightful*, the debtor was a single mother who earned $8,500.00 in the year of her bankruptcy petition. She suffered from emotional problems and lived with her sister because she could not afford housing. Despite these dire financial straits, the Circuit found that she had failed

---

[7]At one point in her testimony, Debtor indicated that a visit to a tanning salon is a "clothing" expense. (N.T. 109). I find that testimony to be disingenuous at best. When questioned about two separate expenditures of over $160.00 at hair salons within a ten week period, Debtor stated, "I'm not about to go down the street to where they cut my hair for $15 and it wouldn't come out right." (N.T. 94 - 95). While I recognize that the adage "you get what you pay for" often is true, I find it impossible to conclude that Debtor's coiffure may not be made perfectly presentable at less than $160.00 a clip.

to satisfy the "undue hardship" test because she could not prove "a total incapacity . . . in the future to pay [her] debts for reasons not within [her] control." *Id.* (citing *In re Faish*, 72 F.3d at 307 (quoting *In re Brunner*, 46 B.R. 752, 758 (S.D. N.Y. 1985))).

In this case, Debtor is a young, single woman with no dependents. She has an undergraduate degree and a law degree. She suffers from no physical or mental impairment to her ability to earn a living commensurate with her level of education. She has held several responsible positions as a paralegal for which she has been paid significant compensation. For example, in the position that she held at the time of trial, her annual salary was $51,500.00. According to her own testimony, a bank had offered her a position at an annual salary of $80,000.00.[8] In short, Debtor is well educated, has acquired marketable skills in the legal field, enjoys good health and is not saddled with dependent care obligations that would prevent her from pursuing future employment. These attributes preclude her from proving that, for reasons beyond her control, she suffers from a total incapacity in the future to pay her student loan debts.

    *c.*    *Were good faith efforts made to repay?*

A debtor seeking to discharge a student loan on the grounds of undue hardship must demonstrate that a good faith effort to repay the loan was made "over the entire time period between the date on which the first loan payment became due and the date on which the debtor filed bankruptcy." *In re Cehula*, 327 B.R. 241 (Bankr. W.D. Pa. 2005). Given my findings regarding Debtor's current and future ability to pay the debt, I need not address this prong of the test. However, I note that the record reflects that Debtor has paid a mere $622.00 toward her

---

[8]The fact that the bank withdrew the offer when Debtor revealed her personal financial situation is not helpful to Debtor's case. Her financial situation is not a circumstance beyond her control.

11

student loans debts of over $150,000.00. Debtor's efforts to repay her obligations have been negligible.

For all of the above-discussed reasons, Debtor's complaint will be denied. An appropriate order will be entered.

By the Court,

*Mary D. France*
Bankruptcy Judge

Date: March 10, 2009

*This document is electronically signed and filed on the same date.*

12

Case 1:05-ap-00162-MDF   Doc 104   Filed 03/10/09   Entered 03/11/09 07:50:40   Desc
Main Document      Page 12 of 12